

Sealed

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

FILED BY _____ D.C.

MAY 10 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ABC, | ) ) ) | 21-CV-80841-SMITH/MATTHEWMAN |
| Plaintiffs, | ) ) ) | Civil Action No. _____ |
| v. | ) ) | Jury Trial Demanded |
| XYZ | ) ) | **Filed Under Seal** |
| Defendants. | ) ) ) | 31 U.S.C. § 3730(b)(2) |

---

## COMPLAINT

Claims Pursuant to the False Claims Act, 31 U.S.C. § 3729, *et seq.*

[FILED IN CAMERA AND UNDER SEAL]

---

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* <br> GREG LUTIN, <br><br> Plaintiffs, <br><br> v. <br><br><br> AMERICAN GENETICS ADVOCATES, LLC <br> KENNETH O'CONNOR <br> JOSEPH WILSON <br> OCEAN POWER MEDIA LLC <br> PALM LEAF CONSULTING LLC <br> JOHN DOE LABS 1-100 <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Civil Action No. <br> _____ <br><br> Jury Trial Demanded <br> **Filed Under Seal** <br> 31 U.S.C. § 3730(b)(2) |

1

## COMPLAINT

Plaintiffs UNITED STATES OF AMERICA ("United States"), by and through Relator Greg Lutin ("Relator" or "*Qui Tam* Plaintiff"), alleges as follows:

### Introduction

1.    Starting no later than 2019, American Genetics Advocates LLC ("AGA" or "Defendant") has engineered and participated in a fraud scheme involving federal health care programs.

2.    This case, in its simplest form, involves the quintessential marketing firm who weaponized "telemedicine" to put a new spin on an age-old scheme of soliciting and receiving payment in exchange for medically unnecessary orders.

### Jurisdiction and Venue

3.    This is a *qui tam* action for violation of the Federal False Claims Act to recover treble damages, civil penalties and attorneys' fees and costs for Plaintiffs, and on behalf of the United States for fraudulent Medicare and Medicaid billings. Non-public information personally known to Relator serves as the basis of this action.

4.    This Court has jurisdiction over this action pursuant to 31 U.S.C. sections 3730(b) and 3732(a), which confer jurisdiction on this Court for actions brought under the Federal False Claims Act and authorize nationwide service of process. Venue is proper in this district pursuant to 31 U.S.C. section 3732(a), as at least one co-conspirator Defendant transacts business in the Southern District of Florida.

### Parties

5.    The plaintiff in this action is the UNITED STATES OF AMERICA ("United States"), by and through Relator Greg Lutin.

6.     Relator Greg Lutin is a resident of Florida.  Relator dealt directly with Defendants and, after discovering their fraudulent behavior, terminated his relationship with them.

7.     American Genetics Advocates, LLC ("AGA") is a marketing company located in Boca Raton, Florida, controlled by Kenneth O'Connor and others.

8.     Kenneth O'Connor is the Chief Executive Officer of AGA.  O'Connor also maintains significant control over the operations of the business.

9.     Joseph Wilson is a managing member of AGA. With O'Connor, Wilson maintains significant control over the operations of the business.

10.     Ocean Power Media, LLC is another company formed by Kenneth O'Connor and is a successor/alter ago to AGA.

11.     Palm Leaf Consulting LLC is a company controlled by Joseph Wilson and it is the legal entity that facilitated payments from laboratory clients.

12.     John Doe Labs 1-100 are unknown clients of AGA who have unlawfully received funds from Medicare and Medicaid related to the scheme described herein.

## The Law

### False Claims Act

13.     The False Claims Act provides that any person who (A) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (B) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," or (C) conspires to do so is liable to the United States for a civil monetary penalty, plus treble damages.  31 U.S.C. § 3729(a)(1); *see also* 28 C.F.R. § 85.5 (setting forth the current penalty amount of not less than $11,181 and not more than $22,363 for each violation).

3

14. The terms "knowing" and "knowingly" are defined to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). A specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

15. The term "material" is defined to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money." 31 U.S.C. § 3729(b)(4).

16. Private parties, such as Plaintiff-Relator, can bring FCA actions on behalf of the United States. 31 U.S.C. § 3730(b). The conditions precedent to Plaintiff-Relator proceeding with these claims have been met. *See id.*

17. There has been no public disclosure under 31 U.S.C. § 3730(e) of the allegations or transactions in this, and all material information relevant to this Complaint was provided to the United States prior to filing this Complaint as required by 31 U.S.C. § 3730(e)(4)(B). Relator has direct and independent knowledge of the information on which the allegations are based. To the extent that any allegations herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to such disclosed allegations.

<u>The Medicare Program</u>

18. In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare program to provide health insurance for the elderly and disabled. *See* 42 U.S.C. § 1395, *et seq.* Payments from the Medicare Program come from a trust—known as the Medicare Trust Fund—which is funded through payroll deductions taken from the work force and government contributions.

19. Medicare now has four parts: Part A (Hospital Insurance); Part B (Medical Insurance); Part C (Managed Care Plans); and Part D (Prescription Drugs). This case involves

4

claims submitted to Medicare Part B. Medicare Part B (Medical Insurance) covers a percentage (typically eighty percent) of the fee schedule amount for physician and laboratory services.

20. To participate in Medicare, providers must certify that their services are provided economically and only when and to the extent medically required, or that the services are "reasonable and necessary." 42 U.S.C. § 1395n; 42 U.S.C. § 1395y(a)(1)(A). A service is expressly excluded from coverage if it is "not reasonable and necessary" for "the diagnosis and treatment of illness or injury or to improve the functioning of a malformed body member." 42 C.F.R. § 411.15(k). In other words, it is an express condition of payment that the treatment sought to be reimbursed under Medicare must be medically necessary.

21. In order to bill the Medicare Program, a provider must submit an electronic or hard-copy claim called a CMS 1500. When the CMS 1500 is submitted, the provider certifies the services in question were "medically indicated and necessary for the health of the patient," that the information on the claim form is "true, accurate, and complete," and that the provider understands that "payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal and State laws." Providers must further certify that their claims comply "with all applicable Medicare . . . laws, regulations, and program instructions for payment including but not limited to the [AKS]."

22. "[Laboratory] tests that are performed in the absence of signs, symptoms, complaints, personal history of disease, or injury are not covered except when there is a statutory provision that explicitly covers tests for screening as described." Medicare Claims Processing Manual: Chapter 16—Laboratory Services § 120.1, available at

5

https://www.cms.gov/Regulations-and-Guidance/Guidance
/Manuals/downloads/clm104C16.pdf.

23.     Medicare establishes its national payment policy for covered items or services through national coverage determinations, which are formal decisions by the Secretary of Health and Human Services regarding whether, and under what circumstances, Medicare covers a particular item or service as deemed medically necessary for a patient. *See* 42 U.S.C. § 1395ff(1); 42 C.F.R. § 405.1060(a).

24.     National coverage determinations are binding on both Medicare contractors and administrative law judges, who preside over Medicare coverage appeals. *See* 42 U.S.C. § 1395ff(1)(A)(i); 42 C.F.R § 405.1060(a).

25.     Medicare contractors process and pay Medicare claims within a specified jurisdiction on behalf of the Centers for Medicare and Medicaid Services ("CMS") and have authority to issue local coverage determinations for that jurisdiction. *See* 42 U.S.C. § 1395ff(f)(2); *See also, id.* § 1395m–1(g) (noting that Medicare contractors may issue local coverage determinations regarding clinical diagnostic laboratory tests under the same process).

26.     Local coverage determinations, like national coverage determinations, govern Medicare coverage for a particular item or service. *See id.* § 1395ff(f)(2)(b).

27.     An entity seeking reimbursement for services provided to Medicare patients must submit a CMS–1500 form to the Medicare contractor. "The [CMS–1500] form reflect[s] the treatment or services provided and identif[ies] the [entity that] provided them. Tests, supplies, and services are correlated to a series of unique numbers, called CPT codes, which quickly convey to the [claims processor] what reimbursable expenses the [entity] has incurred." The CMS–1500 form requires the entity to certify that, among other things, "the services on this form were

6

medically necessary." Health Insurance Claim Form ("CMS–1500") at 2, available at https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS1500.pdf.

The Medicaid Program

28.     The Medicaid Program was created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low-income, blind, or disabled persons, or to members of families with dependent children or qualified pregnant women or children. The Medicaid Program is jointly financed by the federal and state governments. The Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS, administers the Medicaid program on the federal level. Within broad federal rules, each state determines eligible groups, types and range of services, payment levels for services, and administrative and operating procedures.

29.     In order to qualify for federal funds for Medicaid expenditures, each state is required to implement a State Plan containing certain specific minimum criteria for coverage and payment of claims, as set forth by the federal Medicaid statute. 42 U.S.C. §1396a.

30.     Individuals and entities who want to be reimbursed by Medicaid for services provided to beneficiaries must first enroll with Medicaid by submitting an application to the applicable state organization that administers the Medicaid program, or one of its authorized contractors. If the applicant meets the requirements for enrollment, she is then eligible to be paid for qualifying services.

31.     Medicaid providers submit claims for payment to states, which pay the claims and obtain the federal portion of the payment from accounts that draw on the United States Treasury. After the end of each calendar quarter, the state submits to CMS a final expenditure report, which provides the basis for adjustment to the quarterly federal funding amount (to reconcile the

estimated expenditures to actual expenditures). 42 C.F.R. §§ 430.0–430.30 (2018). The federal share of Medicaid expenditures varies by state and can fluctuate annually.

32.     As under Medicare, a claim under Medicaid is only reimbursable if it is "reasonable and necessary for diagnosis or treatment of illness or injury to improve the functioning of a malformed body member." 42 C.F.R. § 402.3.

33.     Typically, prospective providers certify that they must abide by all Federal and State regulations governing the Medicaid program to enroll as a Medicaid provider.

34.     All enrolled Medicaid providers are obligated to abide by these policies and procedures, and all providers expressly certify their compliance. Among the requirements are that providers must comply with all State and Federal laws and regulations related to furnishing Medicaid services (including, for example, the Anti-Kickback Statute), and must not bill for any services not performed or delivered in accordance with all applicable state policies.

<u>Genetic Testing Coding</u>

35.     CPT codes, or procedural codes, describe what kind of procedure a provider has performed. These codes are used throughout the United States, including for billing to Medicare and Medicaid.

36.     The 81400 series of CPT codes contain many of the frequently used codes to bill for genetic testing.

37.     Code 81404 is Molecular pathology procedure, Level 5 (e.g., analysis of 2-5 exons by DNA sequence analysis, mutation scanning or duplication/deletion variants of 6-10 exons).

38.     Code 81405 is Molecular pathology procedure, Level 6 (e.g., analysis of 6-10 exons by DNA sequence analysis, mutation scanning or duplication/deletion variants of 11-25 exons).

8

39.     Code 81408 is the appropriate code for Molecular pathology procedure, Level 9, (e.g., analysis of >50 exons in a single gene by DNA sequence analysis).

40.     Effective no later than December 2020, Medicare identified a limited number of ICD-10 codes that will qualify for coverage for the 81400 series of codes. ICD-10 codes are a classification system of diagnosis codes representing conditions and diseases, related health problems, abnormal findings, and signs and symptoms of disease. Put another way, a patient must have one of the medical conditions specifically identified, in order to qualify for coverage of the genetic test at issue. All of the codes at issue require the test be ordered for a patient suffering from some malignant, cancerous tumor.

41.     Accordingly, Laboratory providers and marketers were on notice that billing genetic testing panels using CPT Codes 81403-81408, for patients without malignant, cancerous tumors is not a covered benefit under Medicare.

The Anti-Kickback Statute

42.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), arose out of Congressional concern that providing things of value to those who can influence healthcare decisions may corrupt their professional judgment and result in federal funds being diverted to pay for goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.   To protect the integrity of Medicare, Medicaid, TRICARE/CHAMPUS, and other federal and state healthcare programs from these harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, without requiring proof that the particular kickback gave rise to overutilization or poor quality of care.

43.     The AKS prohibits any person or entity from knowingly and willfully soliciting or receiving remuneration in return for referring a person for the furnishing of any service for which

payment may be made in whole or in part by a "Federal health care program." *See* 42 U.S.C. § 1320a-7b(b)(1). It also prohibits any person or entity from offering or paying remuneration in order to induce such referrals. *Id.* § 1320a-7b(b)(2). "Remuneration" under the AKS includes anything of value in any manner or form whatsoever, including intangible or indirect economic benefits such as the opportunity to earn tangible money.

44. Willfulness under the AKS requires that the defendant intend to violate the law, but a person "need not have actual knowledge of [the AKS] or specific intent to commit a violation of [the AKS]." 42 U.S.C. § 1320a-7b(h). The knowing and willful payment of remuneration violates the AKS where even one purpose of that payment is to induce referrals.

45. A "Federal health care program" includes "any plan or program that provides health benefits . . . which is funded directly, in whole or in part, by the United States Government," or "any State health care program." A "Federal health care program," as defined by the AKS, includes Medicare, Medicaid, and TRICARE/CHAMPUS.

46. Claims that include items or services resulting from a violation of the AKS are false or fraudulent under the FCA. *See* 42 U.S.C. § 1320a-7b(g).

**FACTUAL ALLEGATIONS**

47. The co-conspirators have submitted or caused to be submitted millions of dollars claims for unnecessary and uncovered genetic testing. At the center of much of this scheme, is a marketer – AGA and its alter ego successor entities. While some marketers operate legitimately within the confines of the AKS and federal law, others, like AGA and its principals and partners, disregard clear Medicare requirements and federal law in order to maximize reimbursement for themselves and their co-conspirators.

10

## The Scheme

48.     AGA and its principals have engineered a fraud scheme that involves prolific sales of patient orders to laboratories for eventual billing to federal health care payers.

49.     The scheme is relatively simple: AGA directly solicits Medicare patients into turning over their personal information. After obtaining these beneficiaries identities, AGA partners with "telemedicine" companies or simply falsifies or forges physicians' signatures to obtain "signed" requisition forms. Once AGA obtains a signed form, AGA sends the form, together with a swab, to a laboratory in exchange for money. To execute and conceal this scheme, AGA makes false representations to Medicare patients and others, using false and fraudulent documentation.

50.     As alleged in greater detail, this scheme is fraud, as the co-conspirators are well aware, in at least four ways: first, the orders are not covered by Medicare because they are not a test related to the treatment of active cancer as required, and these genetic tests are not medically unnecessary because it does not diagnose or aid in the actual treatment of patients. Second, the co-conspirators offer and pay kickbacks to telemedicine companies. Third, the co-conspirators manufactured false and fraudulent documents to cover up the illegitimacy of its operations. Finally, the co-conspirators solicited and received kickbacks from laboratories.

## The "Orders" are Not Covered as Medically Necessary

51.     AGA and its laboratory clients submit claims that are not covered by Medicare – even putting aside the more specific fraud scheme that AGA has engineered using fake documents.

52.     As a general rule, it is not appropriate to bill Medicare for services that are not covered as if they are covered. When billing for non-covered services, whoever submits the claim

11

must use the appropriate billing modifier indicating the service provided was a non-covered service by CMS.

53. As noted previously, the orders at issue involve genetic testing that has not been ordered as medically necessary for the treatment of active cancer by a patient's treating physician. Specifically, Medicare identified a limited number of ICD-10 codes that will qualify for coverage. ICD-10 codes are a classification system of diagnosis codes representing conditions and diseases, related health problems, abnormal findings, signs and symptoms. All of the codes at issue require the test be ordered for a patient suffering from some malignant tumor. Put another way, a patient must have one of the medical conditions specifically identified and the test must be used in the course of the treatment of that condition in order to qualify for coverage of the genetic test at issue.

54. The co-conspirators and their clients are performing and knowingly billing for genetic tests that are not medically necessary because they are not for the treatment of cancer, nor do they aid in the diagnosis or treatment of symptoms experienced by the patient at the time of the test being ordered.

55. Billing for medically unnecessary tests that are not covered, as if they were necessary and covered, violates the False Claims Act.

<u>AGA Prepared Fake Prescriptions</u>

56. AGA approached Relator and his company in 2019 seeking to provide marketing services in exchange for payment.

57. Based on representations from AGA, Relator understood the marketing services to include Medicare patients who had affirmatively indicated an interest in receiving the test and

12

that the test would be ordered by the patient's treating physician, with which the patient had an established treatment relationship.

58.     Relator understood, based on representations from AGA – and more specifically from Kenneth O'Connor – that the marketing operation was compliant with federal and state laws. And, as alleged further, Relator specifically requested an opinion letter from counsel for AGA verifying the legitimacy of the operation was fully compliant with all federal healthcare regulations.

59.     At Relator's insistence, AGA and its principals would receive a monthly flat fee regardless of the number of samples provided, in compliance with the applicable Personal Services and Management Agreement Safe Harbor.

60.     Pursuant to this arrangement, TX Diagnostics LLC – a laboratory with which Relator was affiliated – paid the first flat fee, up front, before any marketing services were provided by the Defendants.

61.     Defendants sent TX Diagnostics the first "batch" of leads under this marketing arrangement. No fewer than thirty-two (32) signed requisition forms and samples were sent by Defendants to TX Diagnostics.

<u>AGA Created Fake Signed Requisition Forms</u>

62.     As part of its standard quality assurance procedures and in order to ensure the samples were legitimately obtained, as had been represented by Defendants, TX Diagnostics began a careful review of the signed forms provided by Defendants.

63.     As TX Diagnostics and Relator began their review, they identified that Defendants or their partners created and sent fake requisition forms.

64.     The forms had a section with the physician's information and signature.

13

65.     On first glance, the information in this section was completed inconsistently – with certain sections typed, other sections in handwriting, and a physician signature in different ink (for example, sometimes the signature would be in black ink while the other handwriting with practice information would be in blue ink).

66.     To determine the validity of these orders, TX Diagnostics reviewed the information provided by the "physicians," including the contact information for their practices and called a number of physician's offices to confirm the orders.

67.     When they called, several physician offices stated that the listed physician never worked at that clinic and that they had no record of that physician at that practice.

68.     In fact, TX Diagnostics was unable to verify any of the orders they called were actually ordered by a physician, let alone a physician with a bona fide physician-patient relationship who intends to use the test to treat said beneficiary, as required by 42 C.F.R. § 410.32(a).

69.     The requisition forms included information inconsistent with the fact that these patients had any relationship with the signing physician, including the fact that the physician was located in a different state than the beneficiary.

70.     In short, the forms "signed" by the physicians were not actually signed by those physicians and were falsified physician orders.

### AGA Lied to Patients

71.     TX Diagnostics also called patients to verify that the orders were legitimately. Although patients confirmed that they were aware of the order, patients did not recall "opting in" to receive a solicitation.

14

72. Instead, patients either had no recollection of receiving a call or were solicited by someone about the test without consent.

73. AGA was supposed to call beneficiaries to confirm the opt-in election.

74. Several patients believed, based on conversations with AGA or its agents, that their doctor requested the tests and handle ministerial issues.

75. Instead, AGA falsely represented the test, purpose, and benefits available to Medicare patients in order to convince them to turn over their personal identifying information.

76. Other patients believed that they were contacted by their insurance company who "asked that they have it done" and then initiated the testing process.

77. Other patients relayed that the test just showed up in the mail.

78. Other patients relayed that the representatives assured them that the test was free or would be covered.

79. None of these representations were true – instead, AGA coerced patients into obtaining unnecessary genetic tests at great cost to Medicare and other federal programs.

<u>AGA and/or its Telemedicine Partners Never Contacted the Patients</u>

80. Some patients also relayed that no medical professional of any kind – including any doctor or nurse practitioner – consulted with them at all.

81. More specifically, several patients relayed that no doctor or nurse practitioner ever contacted the patient to determine whether the test was medically appropriate before ordering the test for that patient.

82. In short, the co-conspirators and their clients are performing and knowingly billing for genetic tests that are not medically necessary because they are not actually ordered by the

physicians listed as signing, and patients were manipulated and/or misled about the nature of the test in order to obtain the patient's information.

83. After learning of these issues, TX Diagnostics did not bill Medicare for the patients' tests.

<u>AGA Lied About Compliance and Legal Vetting of its Marketing Model</u>

84. In order to add an air of legitimacy to its scheme, and after questions were asked by Relator about whether the operations of AGA had been appropriately vetted, AGA provided a letter from "legal counsel" approving the AGA model and its operation purportedly signed by Law Firm 1.

85. This letter was a forgery.

86. In the cover letter, "Todd Shull" the purported Director of Compliance, states that the company "in no way, shape or form, incentivized patients" to induce referrals. The cover letter further states that "we do not pay any doctor or PCP for any services" and that the doctors "bill the insurance company directly."

87. Following this cover letter, AGA attached a letter purportedly dated February 18, 2019, with a subject line "Proposed Marketing Model" and purportedly authored by Attorney 1 of Law Firm 1 (the "Letter").

88. Law Firm 1 is a well-known health care law firm based in Texas.

89. In the Letter, "Law Firm 1" purports to describe AGA's model – reciting that AGA is a marketing company with labs "throughout the United States."

90. The Letter makes representations that AGA will receive no money, except for those from laboratories, capital investments, and loans.

91. The Letter recites that AGA will not directly or indirectly pay physicians.

92.    The Letter then lays out AGA's process for obtaining patient information and, eventually, sending samples and referrals to laboratories. Specifically, the Letter recites that AGA will:

a.   Generate prospective customer information, including biographical information and "whether the prospective customer desires to have a Marketing encounter with an AGA physician."

b.   A "business processing organization" would then confirm the patient's information.

c.   The patient will be transferred to an "AGA physician."

d.   The AGA physician will then transmit the order as directed by the prospective customer.

e.   The laboratory will then either bill or not bill insurance and complete the transaction.

93.    The Letter continues, explaining the "Legal Analysis" was performed (purportedly) by Law Firm 1 and contains several clear errors indicating how and where the Defendants made changes.  The "Legal Analysis" section provides:

**Legal Analysis**

If a laboratories directly or indirectly pays a Marketing company, which in turn pays a Third Part administrator, who in turn writes an order for a product that Medicare pays for, and the order ends up with the laboratory that directly or indirectly pays the Marketing company then the AGA may not be implicated This implication arises from the fact that at the end of the day, the Provider is paying the physician who is writing the order that ends up being transmitted to the Provider This concern does not exist with the AGA model as AGA has explained it to us It is our understanding that with the AGA model, the sole sources of income to AGA are from customers, investment capital and loans from investors We understand that (i) no income to AGA directly or indirectly comes from the Physician and (ii) no owner of or investor in AGA has a direct or indirect equity or other financial arrangement with a Physician that receives orders from laboratories.

17

In order for a violation of the AGA to occur. there must be two elements (i) a referral and (ii) a payment While an order may be transmitted from the laboratory's physician to the Provider. the Provider is not giving anything of value back to AGA Hence. the AGA is not implicated

Sincerely,

Redacted

94. Clear manipulation of what likely was at one point a legitimate legal opinion letter includes substitutions for "AGA" where the letter originally stated "AKS" such as in the first sentence of the first paragraph under Legal Analysis ("…the AGA may not be implicated") and the first sentence of the last paragraph ("[i]n order for a violation of the AGA (sic) to occur…".

95. In truth and fact, as AGA well knew, it did not retain Law Firm-1.

96. In truth and fact, as AGA well knew, AGA did not obtain a review from Law Firm-1 or Attorney 1.

97. In truth and fact, as AGA well knew, Law Firm-1 did not vet or approve AGA's model.

98. To the contrary, AGA appropriated the name and signature of an attorney with Law Firm-1, doctored a prior letter it had received and sent it out as necessary, to conceal the illegalities of its fraudulent marketing operation.

### Defendants Solicited and Received Kickbacks for "Telemedicine" Orders

99. As it relates to its short-lived AGA relationship, TX Diagnostics terminated the relationship and refused to do business with AGA in light of the clear fraud AGA orchestrated. No claims were submitted to Medicare and TX Diagnostics was provided no legitimate marketing services for the flat fee payment of $300,000 made to AGA, through Palm Leaf Consulting LLC.

100.    Unlike Relator and TX Diagnostics, AGA and other labs have and continue to generate and bill a high-volume of claims to federal health care programs.

101.    The scheme AGA tried to use with TX Diagnostics is, based on information and belief, the same it uses for the "labs who practice throughout the United States" that AGA referenced in some its documentation. Specifically, the scheme is as follows:

a.  Using direct solicitation of Medicare beneficiaries through automated robo-dialing and other impermissible means to disseminate fraudulent misrepresentations about the nature of the services, AGA misappropriates Medicare patient information and uses it for its own personal gain.

b.  After inappropriately obtaining the personal information of Medicare beneficiaries, AGA outright falsifies signed physician requisition forms.

c.  Viewed most favorably, AGA occasionally appears to use telemedicine companies to facilitate its scheme, as indicated on signed requisition forms or simply fabricates the forms altogether.

d.  At other times, AGA simply fabricated the requisition forms to make it appear as if a doctor has signed when they had not.

e.  After AGA obtains signed requisition forms, it then submits those to laboratories in exchange for money.

102.    When a laboratory partner does not mandate compliance with a safe harbor compensation arrangement, upon information and belief, AGA seeks compensation arrangements that violate the Anti-Kickback Statute either directly or implicitly ties the number of requisitions forms sent to the compensation set by the laboratories.

19

103.    Upon information and belief, AGA and its successor entity generate millions of dollars each month in "marketing" revenue through its unlawful arrangements with laboratories.

## COUNTS

### COUNT ONE
### FALSE CLAIMS ACT – 31 U.S.C. § 3729(a)(1)(A)

104.    The allegations of paragraphs 1-103 in this Complaint are hereby incorporated by reference.

105.    By the acts described above, Defendants violated the False Claims Act by knowingly presenting, or causing to be presented, false and fraudulent claims for payment and approval to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

106.    By virtue of these acts, the United States has suffered damages and therefore is entitled to treble damages under the False Claims Act plus applicable civil penalties for each violation.

### COUNT TWO
### FALSE CLAIMS ACT – FALSE STATEMENTS – 31 U.S.C § 3729(a)(1)(B)

107.    The allegations of paragraphs 1-103 in this Complaint are hereby incorporated by reference.

108.    By the acts described above, Defendants by and through their own acts, or through the acts of their agents, servants, officers, and employees, knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B).

109.    By virtue of these acts, the United States has suffered damages and therefore is entitled to treble damages under the False Claims Act plus applicable civil penalties for each violation.

20

## COUNT THREE
## FALSE CLAIMS ACT – CONSPIRACY – 31 U.S.C. § 3729(a)(1)(C)

110.    The allegations of paragraphs 1-103 in this Complaint are hereby incorporated by reference.

111.    By the acts above described, Defendants knowingly entered into a conspiracy to present, or cause to be presented, false and fraudulent claims for payment and approval to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A), and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims paid or approved by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B).

112.    By the acts above described, Defendants performed numerous acts to effect the objects of the conspiracy.

113.    By virtue of these acts, the United States has suffered damages and therefore is entitled to treble damages under the False Claims Act plus applicable civil penalties for each violation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs the United States of America, by and through the Relator, demands and prays judgment be entered in their favor against Defendants, jointly and severally, and the following relief:

I.      That Defendants cease and desist from further violations of the False Claims Act;

II.     On Counts One, Two, and Three, that the United States be awarded damages, trebled as required by law, and such civil penalties as are permitted by law, together with all such relief as may be just and proper;

III.    Pursuant to 31 U.S.C. § 3730(d), that the Relator be awarded an amount which the Court decides is reasonable for collecting the civil penalties and damages, and an

21

amount for reasonable expenses which the Court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs;

IV.     That the United States and the Relator receives all other relief, in law and in equity, to which they may reasonably appear entitled; and

## DEMAND FOR A JURY TRIAL

The Plaintiff-Relator demands a jury trial.

Respectfully submitted on this 10th day of May, 2021.

Courtney L. Mohammadi
Florida Bar No. 0091414
courtneymohammadi@pmkm.com
**Pope, McGlamry, Kilpatrick,**
**Morrison & Norwood, P.C.**
3391 Peachtree Road, NE, Suite 300
P.O. Box 19337 (31126-1337)
Atlanta, GA  30326
Telephone: (404) 523-7706
Fax: (404) 524-1648

22